J-E03001-21

2022 PA Super 197

| | | |
|---|---|---|
| AISHA MONROE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CBH20, LP, D/B/A CAMELBACK SKI | : | |
| RESORT D/B/A CAMELBACK SKI | : | |
| CORPORATION | : | No. 1862 EDA 2019 |

Appeal from the Order Dated May 16, 2019
In the Court of Common Pleas of Monroe County Civil Division at No(s):
8184-CV-2016

BEFORE:  PANELLA, P.J., BENDER, P.J.E., BOWES, J., OLSON, J., STABILE, J., KUNSELMAN, J., NICHOLS, J., KING, J., and McCAFFERY, J.

OPINION PER CURIAM:*                    **FILED NOVEMBER 21, 2022**

Aisha Monroe appeals from the May 16, 2019 order that granted the motion for judgment on the pleadings and supplemental motion for summary judgment filed by Camelback Ski Corporation ("Camelback").  As we find that Camelback was not entitled to judgment as a matter of law pursuant to either Pa.R.C.P. 1034 (judgment on the pleadings) or Pa.R.C.P. 1035.1-1035.3 (summary judgment), we reverse the order and remand the case for further proceedings.

---

* We present our decision in this case as a *per curiam* opinion because it is the product of the efforts of more than one member of this panel.  Specifically, Part III(A) of our opinion is attributable to Judge Kunselman.  The remainder of the opinion was authored by Judge Bowes.

## I. Facts and Procedural History

Aisha Monroe initiated this action against Camelback by a complaint that was transferred to Monroe County from Philadelphia County upon the stipulation of the parties. The initial complaint contained a single count of negligence, alleging that Ms. Monroe was injured as the result of Camelback's, *inter alia*, failure "to use reasonable prudence and care to take care of the customers' safety complaints" and its "[a]cting in disregard of the rights of safety of [Ms. Monroe] and others similarly situated[.]" Complaint, 7/27/16, at ¶ 21(c), (e). Camelback filed preliminary objections to strike the above-quoted allegations as "improper, broad and vague." Preliminary Objections, 12/19/16, at ¶ 3. Although the complaint alleged in several places that Camelback acted recklessly and with a conscious disregard of Ms. Monroe's safety, Camelback did not raise preliminary objections in the nature of a more specific pleading regarding the factual underpinnings of the allegations of recklessness. Nor did it object in the nature of a *demurrer* by contending that the allegations of recklessness were legally insufficient.

Ms. Monroe mooted Camelback's preliminary objections by filing an amended complaint again raising a single count of negligence.[1] Therein, she repeated the averment, to which Camelback had stated no prior objection,

---

[1] The amended complaint named the defendant as is represented in the caption of this appeal, namely "CBH20, LP, d/b/a Camelback Ski Resort d/b/a Camelback Ski Corporation."

that Camelback "kn[ew] that there was a high risk of injur[y] during the landing process," and that her injury was "a direct and proximate result of [Camelback] consciously disregarding [her] safety[.]" Amended Complaint, 1/25/17, at ¶¶ 12, 17. Ms. Monroe amended the offending paragraph to state that Camelback's "recklessness, carelessness and negligence" included, *inter alia*:

> a. Failing to properly monitor the speed of the zip-line, in disregard of the safety of [Ms. Monroe];
>
> b. Failing to use reasonable prudence and care by leaving [Ms. Monroe] to land with no help, in disregard of the safety of [Ms. Monroe];
>
> c. [Left blank]
>
> d. Failing to use reasonable prudence and care to respond to [Ms. Monroe]'s safety concerns during the zip[-]lining, specifically when [Ms. Monroe] as[ked Camelback] to slow down the zip[-]lining machine, in disregard of the safety of Ms. Monroe; and,
>
> e. Failing to inspect and/or properly monitor the zip[-]lining machine engine, in disregard of the safety of [Ms. Monroe].

*Id*. at ¶ 21.

Camelback again did not object to the specificity or legal sufficiency of Ms. Monroe's allegations of reckless conduct, opting instead to file an answer, new matter, and counterclaim, contending, *inter alia*, that Ms. Monroe's claim was barred by the Activity Release and Agreement Not to Sue ("Release") that it attached to its pleading. That document indicated that Ms. Monroe acknowledged that she assumed those risks "of which the ordinary prudent person is or should be aware" created by Camelback's amusement activities,

including "injury or even death." Answer, 3/29/17, at Exhibit A. The Release further reflected that, in consideration for the privilege of being allowed to use Camelback's facilities, Ms. Monroe agreed not to sue Camelback for any injury sustained, "even if [she] contend[ed] that such injuries [were] the result of negligence, gross negligence, or any other improper conduct for which a release is not contrary to public policy." *Id*. (capitalization omitted). In its counterclaim, Camelback alleged that it was entitled to damages based upon Ms. Monroe's breach of the release agreement. *Id*. at ¶¶ 47-49.

After Ms. Monroe filed her reply and answer, the trial court entered a case management order ("CMO") establishing pre-trial deadlines. Pursuant to the CMO, counsel were attached for trial during the two-week trial term beginning May 7, 2018. Discovery was to be completed and Ms. Monroe was to serve Camelback with expert reports by November 7, 2017. Camelback was to serve its expert reports and file any dispositive motions by January 8, 2018, which was four months before the earliest trial date.

Camelback did not ask the trial court to rule on the legal sufficiency of Ms. Monroe's complaint by filing a motion for judgment on the pleadings on or before the due date for dispositive motions. Rather, Camelback filed a motion for summary judgment contending only that the Activity Release that Ms. Monroe signed was a complete bar to her negligence claim. *See* Motion for Summary Judgment, 1/8/18, at ¶ 18. The certified record reflects that on March 12, 2018, Ms. Monroe filed both a paragraph-by-paragraph response to

Camelback's summary judgment motion and a memorandum of law in opposition thereto. Ms. Monroe filed of record her evidence demonstrating material issues of fact by attaching exhibits to her memorandum of law, not to the response. **See** Memorandum of Law, 3/12/18, at Exhibits A-C.

The substance of Ms. Monroe's opposition to Camelback's motion was that Camelback's release did not immunize it from reckless conduct, as our Supreme Court ruled in **Tayar v. Camelback Ski Corp.**, 47 A.3d 1190, 1203 (Pa. 2012) ("[E]ven in this voluntarily recreational setting involving private parties, there is a dominant public policy against allowing exculpatory releases of reckless behavior, which encourages parties to adhere to minimal standards of care and safety."). **See** Response in Opposition to Motion for Summary Judgment, 3/12/18, at ¶ 13. In her brief in opposition, Ms. Monroe discussed the evidence, appended to the brief, which she contended supported a finding of recklessness. Specifically, she attached her medical records and the depositions of two Camelback employees who witnessed her injury. **See generally** Memorandum of Law, 3/12/18, at Exhibits A-C. That evidence collectively indicated the following.

There were two similar zip-lines next to each other at Camelback's facility, one with a weight limit of 175 pounds and the other of 250 or 265 pounds. Approximately two to four times each day, depending on the weight of the person using the zip-line, the line would ripple rather than stay level, lifting the rider up and down. In such instances, the heavier rider would have

to pick his or her feet up to avoid slamming into the landing area. The weight limit purported to address the physical limitations which would affect the rider's ability to pick his or her feet up at the end. On the date in question, Ms. Monroe weighed just over 200 pounds. She utilized the zip-line with the higher weight limit, and thus was no more than eighty percent of the maximum capacity. Nonetheless, the zip-line lifted Ms. Monroe up and slammed her into the landing area, causing a broken tibia and fibula requiring substantial medical procedures and expenses, including physical therapy.

Before the trial court ruled on Camelback's motion, it entered an order scheduling a pretrial conference for April 12, 2018, and jury selection for May 8, 2018. Ms. Monroe filed an uncontested motion to vacate the trial listing, indicating that trial was premature given the pendency of Camelback's motion for summary judgment as well as noting counsel's attachment for an Allegheny County trial. The trial court vacated the trial listing and remanded the case for non-binding arbitration.

While arbitration was pending, the trial court issued an order on June 13, 2018, denying Camelback's motion. The trial court explained its ruling as follows:

> Plaintiff's Complaint alleges recklessness on behalf of the Defendant. Pennsylvania law holds that an exculpatory clause in a contract does not release a defendant from liability arising out of recklessness. ***Tayar v. Camelback Ski Corp.***, 47 A.3d 1190 (Pa. 2012). Accepting the facts alleged in Plaintiff's Complaint as true, summary judgment is improper at this time.

Order, 6/13/18.[2]

The parties proceeded to arbitration on October 17, 2018, which resulted in an award in favor of Camelback on Ms. Monroe's negligence claim and in favor of Ms. Monroe on Camelback's counterclaim for breach of the Release. Ms. Monroe filed a timely appeal, and the trial court directed the prothonotary to place the case on the April 2019 trial list and the parties to file pretrial statements in accordance with Pa.R.C.P. 212.1 (providing the plaintiff and defendant shall respectively file pretrial statements sixty and thirty days prior to the earliest trial date). *See* Order, 11/19/18.

On January 14, 2019, Camelback filed a motion *in limine* seeking to preclude Ms. Monroe "from pursuing her claims in negligence or even referencing negligence at time of trial" since she released those claims. Motion *in Limine,* 1/14/19, at unnumbered 6. Raising for the first time in the certified record a contention that Ms. Monroe "failed to establish any evidence of record

_____

[2] While the propriety of this ruling is not before us in this appeal, we observe that the trial court patently applied the standard applicable to judgment on the pleadings, rather than the one pertinent to summary judgment, in ruling on Camelback's motion seeking the latter. *Compare Front St. Dev. Associates, L.P. v. Conestoga Bank*, 161 A.3d 302, 307 (Pa.Super. 2017) (observing that a court adjudicating a motion for judgment on the pleadings must accept as true all well-pleaded facts); *with Cigna Corp. v. Executive Risk Indem., Inc.*, 111 A.3d 204, 210 (Pa.Super. 2015) (explaining that a party may not rest on the pleadings in opposing summary judgment but must proffer evidence to establish issues on which he bears the burden of proof at trial). Pertinent to our analysis *infra*, this order could not but cause Ms. Monroe to believe that her complaint was legally sufficient to allege recklessness such that taking corrective action, by seeking leave to amend the complaint, was unnecessary.

to pursue a claim for 'recklessness' or 'reckless conduct,'" Camelback nonetheless indicated that the "case should proceed to trial, if at all, only on Plaintiff's theory of 'recklessness.'" *Id*. at ¶¶ 19-20. Although Camelback's motion, to the extent that it suggested that Ms. Monroe had insufficient evidence to warrant a trial, was an untimely dispositive motion rather than one seeking a mere evidentiary ruling, the trial court declined to entertain it prior to the trial which was, at the time, still three months away. The trial court instead ordered that the motion was taken under advisement and would "be decided at the time of trial." Order, 1/15/19.

By order entered January 28, 2019, the trial court scheduled a pre-trial conference for March 20, 2019, and jury selection to take place on April 2, 2019. The parties filed their pretrial statements accordingly.

The next docket entry is an order entered memorializing as follows the positions taken at the off-the-record pretrial conference:

> [A]fter pretrial conference with counsel for the parties at which time Plaintiff has indicated that the Defendant's Motion *in Limine* is unopposed, it is ordered that the Motion *in Limine* is granted. It is further ordered that this matter is stricken from the April 2019 trial term. Counsel for Defendant is given thirty (30) days in which to file a Motion for Summary Judgment on the issue of recklessness.

Order, 3/28/19.

On April 16, 2019, which was more than a year after Ms. Monroe opposed Camelback's initial motion for summary judgment with allegations of recklessness, ten months after the trial court ruled that the allegations in

Ms. Monroe's complaint sufficiently established recklessness, and two weeks after the parties had been scheduled to select their jury, Camelback filed a "Motion for Judgment on the Pleadings and Supplemental Motion for Summary Judgment." Therein, Camelback for the first time claimed that Ms. Monroe failed to plead facts that sufficiently describe how Camelback was reckless when she filed the operative complaint, without objection as to specificity, nearly two years prior. *See* Motion for Judgment on the Pleadings and Supplemental Motion for Summary Judgment, 4/16/19, at ¶ 20. Camelback also argued, for the first time of record, that Ms. Monroe's evidence of recklessness was insufficient because the subject matter of Ms. Monroe's claim required expert testimony to establish the pertinent duty of care and how Camelback grossly deviated therefrom. *Id*. at ¶¶ 33-38.

Ms. Monroe submitted a Response in Opposition to Camelback's motion and a Memorandum of Law in support of her response to which were appended Exhibits A through G, which included the report of Steve Wolf, an expert in the construction and operation of zip-lines. On May 16, 2019, the prothonotary docketed those documents as a single filing which became part of the record subsequently certified to this Court. Therein, Ms. Monroe contended that it would be a miscarriage of justice to grant Camelback's motion for judgment on the pleadings because application of the pertinent legal principles to the developed factual record did not reveal that it was certain that no recovery was possible. ***See*** Memorandum of Law in Support of

Response in Opposition to Motion for Judgment on the Pleadings and Supplemental Motion for Summary Judgment, 5/16/19, at unnumbered 8-9. Ms. Monroe further contended that the record revealed a jury question as to whether Camelback acted recklessly, referencing Mr. Wolf's report in addition to the evidence proffered in opposition to Camelback's timely dispositive motion. ***See id***. at 7-8, Exhibit A.

Mr. Wolf opined that the zip-line had a landing platform with a face that "protrudes sharply and vertically from the ground around it, at a 90 degree angle to the ground," making the landing deck "perfectly positioned to cause an injury." ***Id***., Exhibit A at 4.[3] Mr. Wolf's report stated that Camelback could have alleviated that obstacle by "lowering the face of the landing deck to

_____

[3] Mr. Wolf included the following diagram in his report:



Memorandum of Law in Support of Response in Opposition to Motion for Judgment on the Pleadings and Supplemental Motion for Summary Judgment, 5/16/19, Exhibit A at 4.

- 10 -

ground level or filling in the gap between the ground and the face of the landing deck with an aggregate material" such as dirt or sand. *Id*. Mr. Wolf further opined that the staff knew of the danger as evidenced by the fact that they covered the protrusion with a piece of carpeting. However, Mr. Wolf maintained that the carpeting merely concealed the danger rather than remedying it. He concluded: "[T]he injuries sustained by Ms. Monroe are attributable directly to [the] failure of Camelback to act to prevent injury, and the intentional disregard for safety taken by Camelback in their decision to conceal rather than to remove an obvious threat to the safety of their trusting clients." *Id*. at 5.

On May 16, 2019, the trial court entered an order stating that, "upon consideration of the Motion for Judgment on the Pleadings/Motion for Summary Judgment filed by [Camelback], it is hereby ORDERED that said Motion is GRANTED, and all claims against Defendant are DISMISSED, with prejudice." Order, 5/16/19. Thereafter, Ms. Monroe filed a timely notice of appeal, and both she and the trial court complied with Pa.R.A.P. 1925.

On October 22, 2020, a divided panel of this Court affirmed the trial court. The Majority concluded that the trial court properly entered judgment on the pleadings in favor of Camelback because Ms. Monroe's complaint contained insufficient factual averments to support a finding of recklessness. Thus, the Majority did not need to reach the propriety of the entry of summary judgment. However, the Majority noted that, if it had ruled that judgment on

the pleadings had been improper, it would affirm the grant of summary judgment for the reasons stated in the trial court's opinion. The dissent opined that judgment on the pleadings was not properly granted, and that the evidence of record, which properly included Mr. Wolf's expert report, revealed issues of fact that precluded the entry of summary judgment.

Ms. Monroe filed an application for reargument *en banc*, which this Court granted by order of January 6, 2021. The parties filed substituted briefs and this *en banc* panel of the Court heard oral argument on November 30, 2021. Thereafter, authorship of the Majority opinion was assigned and reassigned, ultimately resulting in this *per curiam* disposition.

Ms. Monroe has presented the following questions for our determination:

(1) Upon judgment on the pleadings, the trial court held appellant's first amended complaint failed to set forth a claim of "recklessness." [Camelback] had not filed preliminary objections to the first amended complaint. The complaint pleads recklessness. *Sua sponte* vacating the trial listing upon the eve of trial at the final pre-trial conference, and directing a motion for summary judgment, did the trial court commit an error of law in granting a motion for judgment on the pleadings—therein the court contending the operative complaint did not plead recklessness (secondary to an underlying ski resort release).

Did the trial court err in dismissing the action on the pleadings?

(2) At the final pre-trial conference on the eve of trial, the court of common pleas *sua sponte* vacated the trial listing. Likewise, the court *sua sponte* directed [Camelback]'s renewed motion for summary judgment. At the conference, the trial court held that an expert report was required. In response to [Camelback]'s renewed motion for summary

- 12 -

judgment, [Ms. Monroe] supplied an expert report. [Camelback] did not object to this expert report.

Did the court of common pleas commit an error of law in disregarding Appellant's unobjected to expert report that the trial court itself directed?

(3)     Does the record as a whole warrant the denial of summary judgment as creating an issue of fact as to "recklessness" (upon a ski resort release)?

(4)     Did the court of common pleas commit an error of law in *sua sponte* striking the trial listing on the eve of trial, directing [Camelback]'s motion for summary judgment, directing [Ms. Monroe]'s expert report, and then granting the trial[-]court[-]directed summary judgment (on the same date as the response in opposition)?

Ms. Monroe's substituted brief at 15-16.

## II.    Applicable Law

Rather than address Ms. Monroe's issues *seriatim*, we find it most expedient to consider them together.[4]  Ms. Monroe argues that the trial court "erred as a matter of law in dismissing the complaint for failure to plead recklessness upon the renewed *sua sponte* late-directed motion for judgment on the pleadings, on the eve of trial, following the denial of summary judgment

_____

[4]  Ms. Monroe's appellate brief is not a paradigm of appellate advocacy.  It is more akin to a bullet-point list than to a fully-developed writing.  However, the brief sufficiently presents her issues and supports her claims of error with citation to pertinent authority such that our review is unhampered.  Therefore, we conclude no sanction is warranted.  *Cf. In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." (cleaned up)).

- 13 -

as to that precise issue—regardless that the complaint did plead and the evidence did show recklessness." Ms. Monroe's substituted brief at 26-27 (cleaned up). She likewise contends that leave to file the late, renewed motion for summary judgment was improperly granted to Camelback under these circumstances. *Id*. at 32. Ms. Monroe further maintains that summary judgment was not warranted because the evidence of record, which included Mr. Wolf's expert report, "evidenced an issue of fact of recklessness for the jury," as the trial court had ruled when denying Camelback's original motion. *Id*. at 31.

We commence with a review of the pertinent legal principles. Motions for judgment on the pleadings are in the nature of a demurrer and are governed by Pa.R.C.P. 1034. That rule states as follows: "(a) After the relevant pleadings are closed, but within such time as not to unreasonably delay the trial, any party may move for judgment on the pleadings. (b) The court shall enter such judgment or order as shall be proper on the pleadings." Pa.R.C.P. 1034. "Judgment on the pleadings may be entered when there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law." ***Baumbach v. Lafayette Coll.***, 272 A.3d 83, 88 (Pa.Super. 2022) (cleaned up).

> This Court's scope and standard of review of an appeal from the grant of judgment on the pleadings is plenary, and we must determine whether the action of the court below was based on a clear error of law or whether there were facts disclosed by the pleadings which should properly go to the jury. Our review,

therefore, is limited to determining whether the trial court abused its discretion or committed an error law.

*City of Coatesville v. Jarvis*, 902 A.2d 1249, 1251 (Pa.Super. 2006) (cleaned up).

Rule 1035.2, which governs motions for summary judgment, provides as follows:

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2. In sum, before a court is permitted to enter judgment as a matter of law rather than allow the jury to decide the case, it must be clear and free from doubt that there is no combination of facts to be gleaned from the evidence that would support a finding for the non-moving party. *See*, *e.g.*, *Braswell v. Wollard*, 243 A.3d 973, 977 n.3 (Pa.Super. 2020) ("Summary judgment will be granted only in those cases which are free and clear from doubt. Where the facts can support conflicting inferences, it cannot be said that the case is free from doubt and thus ripe for summary judgment." (cleaned up)).

- 15 -

An appellate court "may disturb the order of the trial court [granting summary judgment] only where it determines that the court committed an error of law or abused its discretion." **Valles v. Albert Einstein Med. Ctr.**, 805 A.2d 1232, 1236 n.7 (Pa. 2002). In doing so, we "apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact." **Criswell v. Atl. Richfield Co.**, 115 A.3d 906, 908–09 (Pa.Super. 2015). "A trial court abuses its discretion by making a manifestly unreasonable, arbitrary, or capricious decision; by failing to apply the law; or by allowing prejudice, bias, or ill will to influence its decision." **Calisto v. Rodgers**, 271 A.3d 877, 884-85 (Pa.Super. Feb. 25, 2022) (*en banc*).

## III. Analysis

Mindful of the above principles, we turn to the trial court's rulings in the instant case. The trial court's opinion offered the following rationale for its decision to grant Camelback's motion filed pursuant to both Rule 1034 and Rule 1035.2. The trial court eventually came to believe, after addressing Camelback's motion *in limine*, that Ms. Monroe did not plead sufficient allegations of recklessness. **See** Trial Court Opinion, 8/16/19, at 8-9. If the trial court had understood Camelback's position clearly at the time it ruled on Camelback's initial motion for summary judgment, which did not address the allegations of recklessness, the trial court would have granted the initial dispositive motion rather than, out of "an abundance of caution," allowing the

case to proceed. *Id*. at 10. However, the court candidly admitted that, coming as it did "well after the parties had already undergone arbitration, Plaintiff appealed, and the matter had been rescheduled for a new trial date," Camelback's second dispositive motion may have at that "point be[en] considered untimely." *Id*.

Therefore, the trial court alternatively explained why it believed Ms. Monroe's claim was properly dismissed with prejudice via summary judgment. The court made it clear that, in examining the evidence to discern a question of material fact, it "could not and did not consider" the expert report of Mr. Wolf. *Id*. at 11. Although the trial court "did not dispute" that Pa.R.C.P. 1035.3(b) granted Ms. Monroe the right to supplement the record with an expert report in response to Camelback's motion for summary judgment, it determined that she "did not do so properly." *Id*. Specifically, the court concluded that, because the report was attached to Ms. Monroe's brief in opposition to Camelback's motion, and "'briefs are not a part of the official record,'" Mr. Wolf's expert report did not become part of the evidence which could defeat summary judgment. *Id*. (quoting *Scopel v. Donegal Mut. Ins. Co.*, 698 A.2d 602, 606 (Pa.Super. 1997)). Finally, the court determined that an examination of "the entirety of the record before [it]," revealed "insufficient evidence in the record showing Camelback acted with conscious action or inaction that created a substantial risk of harm to [Ms. Monroe]." *Id*. at 14 (cleaned up).

For the following reasons, we hold that the trial court's adjudication of Camelback's dispositive motion is the product of multiple errors of law that require reversal.

## A. Camelback's Motion for Judgment on the Pleadings was Improperly Granted

We first conclude that the trial court committed an error of law when it reversed its initial determination that Ms. Monroe's complaint properly alleged recklessness and opted to grant Camelback's motion for judgment on the pleadings. Rule 1019 of the Pennsylvania Rules of Civil Procedure governs our analysis. That Rule provides in relevant part:

> **Rule 1019. Contents of Pleadings. General and Specific Averments**
>
> (a) The material facts on which a cause of action or defense is based shall be stated in a concise and summary form.
>
> (b) Averments of fraud or mistake shall be averred with particularity. Malice, intent, knowledge, and other conditions of mind may be averred generally.

Pa.R.C.P. 1019. The plain language of this Rule thus indicates that, while a party must plead the material facts that support a cause of action, a party may generally aver knowledge, intent, and state of mind. Thus, the question in the instant case is whether recklessness constitutes a state of mind or a material fact upon which a cause of action is based.

To answer that question, we begin with a general discussion of tort liability. In their learned treatise, PROSSER AND KEATON ON TORTS (5th ed. 1984), the authors observed that "The fundamental basis of tort liability may

- 18 -

first be divided into three parts . . . because every case in which such liability has been imposed has rested upon one of three, and only three, grounds for imposing it. These are: 1) [Intentional torts]. 2) Negligence. 3) Strict liability." *Id*. at § 7 at 32. Each of these types of torts constitutes a separate cause of action. Notably, gross negligence and recklessness have not historically been identified as independent causes of action. Instead, they are aggravated forms of negligence. *See id*. at § 34 at 208-14. The level of care required is in proportion to the apparent risk involved; the greater the danger, the greater the level of care required by the actor. *See id*.

Gross negligence and recklessness have been described as follows:

*Gross negligence*. As it originally appeared, this was very great negligence, or the want of even slight or scant care. It has been described as a failure to exercise even that care which a careless person would use . . . [M]ost courts consider that "gross negligence" falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree and not in kind . . .

*Willful, Wanton, and Reckless*. A different approach, at least in theory, looks to the actor's real or supposed state of mind. Lying between the intent to do harm, . . . and the mere unreasonable risk of harm to another involved in ordinary negligence, there is a penumbra of what has been called "quasi-intent." To this area, the words "willful," "wanton," or "reckless" are customarily applied; and sometimes in a single sentence, all three . . . They have been grouped together as an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care . . . They apply to conduct which is still, at essence, negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if it were so intended. Thus, it is held to justify an award of punitive damages, . . . and it will avoid the defense of ordinary negligence on the part of the plaintiff.

The usual meaning assigned to [these words] is that the actor has intentionally done an act of unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences. Since, however, it is almost never admitted and can be proven only by the conduct and circumstances, an objective standard must of necessity in practice be applied. The "willful" requirement breaks down . . . where is it clear from the facts that the defendant, whatever his state of mind, has proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position.

. . . [T]here is often no clear distinction at all between [this] conduct and "gross negligence" and the two have tended to merge and take on the same meaning, an aggravated form of negligence, differing in quality rather that in degree from ordinary lack of care. It is at least clear that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence or simple inattention. . . .

*Id*. at 211-14.

In other words, gross negligence and recklessness are states of mind; they are forms of negligence, not independent causes of action. Thus, our procedural rules allow the plaintiff to plead gross negligence and recklessness generally. *See* Rule 1019(b).

This Court affirmed that recklessness could be averred generally in *Archibald v. Kemble*, 971 A.2d 513 (Pa.Super. 2009). There, an injured player in an adult "no check" ice hockey league sought damages from another player who checked him in violation of the league rules. Initially, we determined that the defendant hockey player must have engaged in reckless conduct to be subject to liability. We then explained, "even though we hold

- 20 -

the plaintiff must prove the defendant acted recklessly, the cause of action remains sounding in negligence." *Id*. at 519. "Therefore, merely determining the degree of care is recklessness does not give rise to a separate tort that must have been pled within the applicable statute of limitations." *Id*. Thus, we concluded that the plaintiff's cause of action was subsumed within the negligence count pled in the complaint.[5]

We then looked to whether the plaintiff had produced sufficient evidence of recklessness to determine whether summary judgment was appropriate. As we observed:

> Archibald has produced evidence that he and Kemble played in a league where Kemble knew he had a responsibility to Archibald not to engage in certain conduct including checking. Thus, Archibald has produced evidence that Kemble owed a duty of care to Archibald.

> Archibald described the action as being intentional. [A h]ockey expert . . . explained if the incident occurred as Archibald explained that it was a "deliberate action." [The expert] explained Kemble's action could cause serious injury. Kemble explained he had been skating for fourteen years, that he understood the term "check" to mean knocking a person down, and that he understood slew-footing was prohibited by league rules. Thus, Archibald has produced evidence that Kemble breached his duty of care by acting recklessly.

---

[5] We agree with the Dissent that Rule 1019(b) requires a plaintiff to at least make a general averment of recklessness. *See* Dissenting Opinion at 16. It is not clear from the *Archibald* opinion whether such a general averment appeared in the complaint in that case. However, to the extent clarification is necessary, it is not enough to plead only negligence and proceed with a claim for recklessness; recklessness and gross negligence must be pled in the Complaint. Here, Ms. Monroe did make an express general averment of recklessness.

*Id*. at 520.

**Archibald** recognizes the important distinction between the pleadings stage of the case and the summary judgment stage of the case. At the pleadings stage, the rules allow a plaintiff to make a general averment of gross negligence or recklessness. When initially filing a complaint, a plaintiff may not be fully aware of the defendant's state of mind. Only through discovery can the plaintiff ascertain what the defendant knew or should have known about the risk involved. It would place an undue burden on the plaintiff to plead specific facts about a defendant's state of mind at the time a lawsuit is initiated.

Discovery gives the plaintiff an opportunity to learn this information. Through interrogatories, depositions, and requests for admission, a plaintiff can learn whether a defendant had notice of a dangerous condition before the plaintiff was injured. A plaintiff can discover information about the defendant's training and experience to see if the defendant knew or should have known about the risk involved that lead to plaintiff's injuries. The discovery phase of the case also gives the plaintiff time to hire an expert to investigate and opine on the standard of care and whether it was breached, not only in terms of ordinary negligence, but whether there were gross or reckless deviations from the standard of care.

Once discovery is complete, then a plaintiff can be required to produce evidence of recklessness. If a plaintiff fails to produce the evidence, Rule

1035.3 provides that summary judgment should be entered for the defendant on the plaintiff's claims. That is exactly what happened in **_Archibald_**, **_supra_**. The plaintiff alleged a cause of action in negligence, allegations of recklessness were subsumed in this claim, and then the plaintiff produced evidence of recklessness to overcome the motion for summary judgment.

Here, we reach the same conclusion. Ms. Monroe has generally averred recklessness and specifically averred facts of negligence to support her claim. She alleged in her amended complaint:

> [Camelback's] recklessness, carelessness and negligence included, but was not limited to:
>
> > a. Failing to properly monitor the speed of the zip-line, in disregard of the safety of [Ms. Monroe];
> >
> > b. Failing to use reasonable prudence and care by leaving [Ms. Monroe] to land with no help, in disregard of the safety of [Ms. Monroe];
> >
> > c. [Left blank]
> >
> > d. Failing to use reasonable prudence and care to respond to [Ms. Monroe]'s safety concerns during the zip[-]lining, specifically when [Ms. Monroe] as[ked Camelback] to slow down the zip[-]lining machine, in disregard of the safety of Ms. Monroe; and,
> >
> > e. Failing to inspect and/or properly monitor the zip[-]lining machine engine, in disregard of the safety of [Ms. Monroe].

Amended Complaint, 1/25/17, at ¶ 21.

These specific allegations of negligence and general allegations of recklessness are sufficient to meet the requirements of Rule 1019(a) and (b).

Therefore, we hold that the trial court erred as a matter of law in concluding otherwise.[6]  Camelback's motion for judgment on the pleadings should have been denied.

**B.    Camelback's Motion for Summary Judgment was Improperly Granted**

---

[6] The Dissent would affirm on the basis that Ms. Monroe failed to plead specific facts of recklessness.  ***See*** Dissenting Opinion at 19-21.  As our discussion above makes plain, this is a misapplication of Rule 1019, which only requires that the basis of a cause of action be pled with specific facts, while conditions of the mind may be pled generally.  As the Dissent notes, the question of whether a complaint sufficiently pleads recklessness (and often an accompanying claim for punitive damages) has produced inconsistent rulings in the trial courts and understandable confusion among litigants.  ***See*** Daniel E. Cummins, "Pleading for Clarity: Appellate Guidance Needed to Settle the Issue of the Proper Pleading of Recklessness in Personal Injury Matters," 93 Pa. B.A.Q. 32 (Jan.2022).

This confusion appears to be due to some trial courts misapplying Rule 1019 in the same manner as advocated by the Dissent.  ***See***, ***e.g.***, ***Green v. Kline***, 16 Pa. D.&C. 5th 144 (Monroe Co. 2010); ***Brace v. Shears***, 12 Pa. D.&C. 5th 166 (Centre Co. 2010); ***Debo v. Buckley***, 44 Pa. D.&C. 4th 325 (Snyder Co. 1999).  ***Cf. Koloras v. Dollar Tree Stores, Inc.***, 21 CV 2700, 2022 WL 1529191 (Lacka. Co. April 19, 2022) ("[T]he plain language of Rule 1019(a) only requires 'material facts' to 'be stated in a concise and summary form' in support of 'a cause of action or defense.'  . . .  [Plaintiffs'] averments of recklessness may be averred generally under Rule 1019(b) as a condition of mind.").  These and all other trial court decisions that have sustained preliminary objections or granted judgment on the pleadings based upon demands for heightened factual averments to support a claim of willful, wanton, or reckless conduct did not accurately apply the law.  Our ruling today removes any doubt that, so long as a plaintiff's complaint (1) specifically alleges facts to state a *prima facie* claim for the tort of negligence, and (2) also alleges that the defendant acted recklessly, the latter state-of-mind issue may only be resolved as a matter of law after discovery has closed.

Recognizing that its decision to grant judgment on the pleadings was problematic, albeit for a different reason,[7] the trial court alternatively opined that it should be affirmed because Camelback was entitled to summary judgment pursuant to Rule 1035.2. Accordingly, we consider the propriety of

_____

[7] As we noted above, the trial court all but conceded in its opinion that Camelback's motion for judgment on the pleadings was untimely. **See** Trial Court Opinion, 8/16/19, at 10. We agree with that assessment.

If not from day one when Ms. Monroe filed a complaint alleging that Camelback consciously disregarded her safety and recklessly caused her injuries, then no later than June 13, 2018, when the trial court entered an order denying Camelback's timely motion for summary judgment for the specific reason of the recklessness allegations, Camelback was on notice that Ms. Monroe's case was based on the claim that her injury was sustained as a result of conduct by Camelback which rose to the level of recklessness. However, at no time in the following ten months did Camelback seek judgment based upon a pleading deficiency. Instead, it filed a dispositive motion masquerading as a motion *in limine* raising the issue on the eve of trial, and the trial court reacted by striking the case from the trial list to give Camelback an additional thirty days to seek summary judgment. **See** Order, 3/28/19. Camelback instead filed a motion seeking judgment pursuant to either Pa.R.C.P. 1034 or 1035.2, fifteen months past the CMO deadline for filing dispositive motions.

In light of this history, Camelback's motions, raised unnecessarily and without justification after the time the case was set to be tried, were presented at such a time to unreasonably delay trial. Plainly, Camelback was fully aware of the evolution of Ms. Monroe's claim during the course of the litigation, and its post-discovery attempt to obtain judgment based upon the pre-discovery allegations of fact was mere gamesmanship. Nonetheless, while Ms. Monroe forwards on appeal an argument that Camelback's Rule 1034 motion should have been denied based upon its untimeliness, the certified record does not indicate that she made a precise objection concerning the timing of the motion in the trial court. Therefore, we do not reverse the trial court on that basis. **See**, **e.g.**, **In re S. C.**, 421 A.2d 853, 856 (Pa.Super. 1980) ("It is well established that a party must preserve a specific point for appellate review by raising it first in the lower court; a different theory of relief may not be successfully advanced for the first time on appeal.").

the trial court's summary judgment ruling by "reviewing all the evidence of record to determine whether there exists a genuine issue of material fact."[8] **Criswell**, **supra** at 908–09. Specifically, we must examine the record to discern whether Ms. Monroe developed facts to support her allegations that she was injured as a result of Camelback's reckless conduct.

The initial step in that analysis is to determine what evidence was and was not part of the record. As detailed above, the trial court opined that the expert report Ms. Monroe produced in opposing Camelback's motion for summary judgment was not part of the official record because it was appended to her brief. **See** Trial Court Opinion, 8/16/19, at 11. That ruling is legally erroneous.

First, our Supreme Court has determined that, for purposes of ruling on a motion for summary judgment, the "record" includes any and all "(1) pleadings, (2) depositions, answers to interrogatories, admissions and affidavits, and (3) reports signed by an expert witness that would, **if filed**, comply with Rule 4003.5(a)(1), whether or not the reports have been

---

[8] Arguably, Camelback's second bid for summary judgment, which unquestionably delayed trial, could be considered improperly entertained for that reason alone. However, since such a motion at least examines the facts as they had been developed for trial, rather than as a snapshot taken when the complaint was filed years earlier, we find the lateness of the summary judgment motion is less outrageous. In any event, as we have noted, the certified record does not indicate that Ms. Monroe objected to the untimeliness of the motion with sufficient specificity to permit us to reverse on that basis.

produced in response to interrogatories."[9]   Pa.R.C.P. 1035.1 (emphasis added).   The foregoing language suggests that expert reports need only be submitted, not filed, in order to be considered in ruling on the motion for summary judgment.   Ms. Monroe's expert report is signed by Steve Wolf, contains the substance of his facts and opinions and the basis for those opinions, and substantially conforms with Rule 4003.5(a)(1).   Thus, the expert report was included in the "record" for purposes of Rule 1035.1 and summary judgment, regardless of whether it was filed in the official record.

_____

[9]  That Rule provides:

> Discovery of facts known and opinions held by an expert, otherwise discoverable under the provisions of Rule 4003.1 and acquired or developed in anticipation of litigation or for trial, may be obtained as follows:
>
> (1) A party may through interrogatories require
>
>> (A) any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on which the expert is expected to testify and
>>
>> (B) subject to the provisions of subdivision (a)(4), the other party to have each expert so identified state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The party answering the interrogatories may file as his or her answer a report of the expert or have the interrogatories answered by the expert. The answer or separate report shall be signed by the expert.

Pa.R.C.P. 4003.5(a).

Second, and more obvious, the certified record before us reveals that Ms. Monroe's Response in Opposition, Brief, and expert report marked as Exhibit A, along with the rest of the exhibits appended to her brief, **were filed in the official certified record** and docketed as one document. The trial court's belief that the expert report was not made part of the record because it was attached to the brief was based on a misunderstanding of our decision in *Scopel*, *supra*. The issue in *Scopel* was whether depositions attached to the brief in opposition to summary judgment were part of the record when **the brief and depositions were not actually filed**. *See Scopel*, *supra* at 604 ("These depositions . . . were never filed and made a part of the official record."). Therefore, the court ruled it could not consider them, and this Court affirmed. *Accord Commonwealth v. Preston*, 904 A.2d 1, 6 (Pa.Super. 2006) ("[A]ny document which is not part of the officially certified record is deemed non-existent—a deficiency which cannot be remedied merely by including copies of the missing documents in a brief or in the reproduced record.").

Where, as here, the expert report was filed with the prothonotary as part of the summary judgment response, it and the rest of the exhibits were properly part of the record before the trial court in deciding the summary judgment motion. *See* Pa.R.A.P. 1921 (providing that the official record includes "[t]he original papers and exhibits filed in the lower court" and "paper copies of legal papers filed with the prothonotary by means of electronic

filing"). Therefore, the trial court erred as a matter of law in disregarding Mr. Wolf's report in determining whether there was a material issue of fact as to recklessness by Camelback.[10]

Camelback alternatively argues, with no apparent sense of irony, that Mr. Wolf's expert report was properly excluded because it was not produced in accordance with the CMO deadline, but instead in response to the dispositive motion that it filed fifteen months after the CMO deadline. Citing **Kurian ex rel. Kurian v. Anisman**, 851 A.2d 152 (Pa.Super.2004), and **Wolloch v. Aiken**, 815 A.2d 594, 596 (Pa. 2002), Camelback suggests that the trial court had the discretion to exclude the late-produced expert report. **See** Camelback's brief at 24-30.

The certified record does not reflect that Camelback objected to the late production of the report or moved for its exclusion. More importantly, the trial court did not cite the lateness of the report's production as its basis for ignoring it, but instead the erroneous belief that it was not part of the record because it was stapled behind the wrong part of Ms. Monroe's filing. On the contrary, the trial court rejected the notion that the report was untimely,

---

[10] The only other case Camelback offers to support the trial court's ruling on this issue is an unpublished memorandum filed in 2017. **See** Camelback's brief at 22. However, with exceptions not applicable here, "[a]n unpublished memorandum decision filed prior to May 2, 2019, **shall not be relied upon or cited** by a Court or a party in any other action or proceeding[.]" 210 Pa.Code § 65.37 (emphasis added). Consequently, we must reject Camelback's attempt to persuade us that the expert report was not properly before the trial court by invoking a decision that is not properly before us.

expressly stating that it did not dispute Ms. Monroe's right to supplement the record with an expert report pursuant to Pa.R.C.P. 1035.3(b), even after the close of discovery.[11] *See* Trial Court Opinion, 8/16/19, at 11.

We agree with the trial court that Rule 1035.3(b) entitled Ms. Monroe to supplement the record in response to Camelback's motion. As our Supreme Court noted in *Gerrow v. John Royle & Sons*, 813 A.2d 778, 781-82 (Pa. 2002) (plurality), "the intent of the motion for summary judgment is not to eliminate meritorious claims that could be established by additional discovery or expert reports." Thus, "it is consistent with that intent to permit supplementation of the record under Rule 1035.3(b) to allow the record to be enlarged by the addition of such expert reports." *Id*. Accordingly, although the plaintiff had failed to produce expert reports within the time constraints of the CMO, and the trial court refused to consider them "as an impermissible attempt to circumvent the deadline," the Court ruled that the reports were properly filed pursuant to Rule 1035.3(b). *Id*. at 780.

While *Gerrow* was a plurality decision, this Court sitting *en banc* relied upon it in concluding, without qualification, as follows: "There is no doubt that Rule 1035.3 permits a party to supplement the record when it files a motion in opposition to the entry of summary judgment." *Burger v. Owens Illinois,*

---

[11] That rule states: "An adverse party may supplement the record or set forth the reasons why the party cannot present evidence essential to justify opposition to the motion and any action proposed to be taken by the party to present such evidence." Pa.R.C.P. 1035.3(b).

*Inc.*, 966 A.2d 611, 618 (Pa.Super. 2009) (*en banc*). Hence, at this point it is well-settled that, pursuant to Rules 1035.1 and 1035.3, affidavits and expert reports may be used by the non-moving party to create an issue of material fact to defeat a motion for summary judgment, and supplementary expert reports are timely if submitted within thirty days of the motion for summary judgment. *See* Pa.R.C.P. 1035.3(b).

The *Wolloch* and *Kurian* cases cited by Camelback do not compel a different result. Camelback correctly indicates that the holding of *Wolloch* was "that expert reports submitted **after the entry of summary judgment** were properly excluded and that permitting such late amendments would undermine judicial efficiency and case management orders[.]" Camelback's brief at 28 (emphasis added). The plaintiff in that case did not utilize Rule 1035.5(b) to supplement the record in opposing summary judgment, but rather "waited until after summary judgment had been entered, then submitted the expert reports in such indolent fashion that the trial court had no time to consider them before the lapse of [the] allowable time to appeal from summary judgment." *Wolloch*, *supra* at 596–97. When the plaintiff on appeal attempted to invoke Rule 1035.3(b) as authority for her actions, the High Court, citing *Gerrow*, observed: "This is a curious argument. [The plaintiff] did not file a timely response to the motion for summary judgment supplemented with her expert reports, **though Rule 1035.3(b) permits it**."

*Id*. at 596 (emphasis added). As such, **Wolloch** hurts, rather than helps, Camelback's position.

In **Kurian**, this Court examined the interplay between Rule 1035.3(b)'s allowance of production of expert reports within thirty days of the filing of a motion for summary judgment, and Rule 4003.5(b), which allows a court to prohibit a late-identified expert witness from testifying at trial.[12] We concluded that, reading the rules in harmony, Rule 1035.3(b) did not override the trial court's authority to exclude an untimely expert, for requiring that an "expert report be admitted just as long as it was filed within thirty days of the summary judgment motion would take away the very discretion Rule 4003.5(b) gives to the trial court and make a mockery of court orders and court-imposed deadlines." *Id*. at 161. Therefore, we held that, "when a party makes a timely response to a summary judgment motion and attempts to supplement the record with otherwise untimely expert reports, the court may, on its own motion, determine whether this is allowed under Rule 4003.5(b)."

---

[12] The full text of Rule 4003.5(b) is as follows:

> An expert witness whose identity is not disclosed in compliance with subdivision (a)(1) of this rule shall not be permitted to testify on behalf of the defaulting party at the trial of the action. However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.

Pa.R.C.P. 4003.5(b). As quoted *supra* at note 9, subdivision (a)(1) governs what expert witness information is discoverable through interrogatories.

*Id*. at 159. However, we were clear that, in doing so, "the court must apply the long-standing prejudice standard found in the caselaw construing Rule 4003.5(b)." *Id*. at 159-60. That prejudice standard acknowledges that the "preclusion of testimony is a drastic sanction, and it should be done only where the facts of the case make it necessary; the prejudice may not be assumed." *Id*. at 162 (cleaned up). In particular:

> Assuming that a party has not acted in bad faith and has not misrepresented the existence of an expert expected to be called at trial, no sanction should be imposed unless the complaining party shows that he has been prejudiced from properly preparing his case for trial as a result of the dilatory disclosure.

*Id*. (cleaned up).

Applying this ruling to the facts of that case, we affirmed the trial court's preclusion of the expert in that case. Contrasting *Gerrow*, in which the opposing party suffered no prejudice, we highlighted the fact that the trial court excluded the expert in *Kurian* based upon the findings that "1) appellants continually violated court ordered deadlines, and 2) the acceptance of this expert witness report on the day the parties were supposed to go to trial would cause appellees unfair surprise and prejudice." *Id*.

Camelback argues that this case is in alignment with *Kurian* rather than *Gerrow*. It highlights the times in the procedural history of the case in which Ms. Monroe did not produce an expert report and observes that it was not until "eighteen (18) months after the report was due, and two months after her pre-trial report was submitted, that [Ms. Monroe], with trial looming, produced

a surprise expert report after agreeing to dismiss her negligence case." ***Id***. at 29.

Camelback's argument, in addition to being legally unsound, is made with an impressive level of indignation given how it utterly disregarded the CMO deadlines and Rules 1034 and 1035.2 by first raising its challenge to the sufficiency of Ms. Monroe's allegations and evidence of recklessness in a manner that delayed trial, fifteen months after the deadline for dispositive motions. In particular, the trial court in this case not only failed to make the requisite finding of prejudice, but indicated that it would have allowed Mr. Wolf's report had Ms. Monroe filed it properly.[13] Precluding the report as a discovery sanction without finding prejudice is cause for reversal. ***See Reeves v. Middletown Ath. Ass'n.***, 866 A.2d 1115, 1127 (Pa.Super. 2004) (finding abuse of discretion where trial court refused to consider expert reports supplementing the record without first determining whether there was prejudice).

Nor do we discern evidence in the certified record that would support a finding of prejudice in this case. Unlike the plaintiffs in ***Kurian***, there is no evidence that Ms. Monroe acted in bad faith, misrepresented the existence of an expert, or showed contempt for court deadlines. Further, if Camelback had raised its challenge to the recklessness allegations in accordance with the

---

[13] She did. ***See*** pages 28-29, *supra*.

CMO, Ms. Monroe's response would have been produced three months before the earliest trial date, not on the day of trial as in ***Kurian***. The trial court itself at the pretrial conference clearly opted to disregard the CMO deadlines and trial schedule and allow Camelback to file a motion out of time. Not extending the similar benefit to Ms. Monroe would have been unreasonable. Any prejudice resulting from the surprise to Camelback was easily remedied by giving it time to amend its pretrial statement and produce an expert if it so desired. Plainly, at that point, neither the trial court nor Camelback was concerned about delaying trial.

As such, Ms. Monroe properly supplemented the official record with Mr. Wolf's expert report. Therefore, we shall examine that record, including Ms. Monroe's expert report, to discover whether Ms. Monroe produced sufficient evidence to establish the factual predicate for a finding of recklessness. For if she did, summary judgment should have been denied.

Before we examine the evidence, we review the substantive law applicable to Ms. Monroe's claim that she was injured as a result of Camelback's reckless conduct. While Ms. Monroe was required to prove, based upon her waiver of negligence claims against Camelback, that Camelback acted recklessly, there is no "recklessness" tort in this Commonwealth separate and apart from a cause of action sounding in negligence. Rather, to recover for her injuries despite her execution of the Activity Release, Ms. Monroe must prove the elements of the tort of

negligence, namely "duty, breach, causation and damages,"[14] and additionally prove that Camelback's deviation from the standard of care was more egregious than garden-variety negligence. ***See***, ***e.g.***, ***Tayar, supra*** at 1200; ***Archibald***, ***supra*** at 519; ***Ammlung v. City of Chester***, 302 A.2d 491 (Pa.Super. 1973). For, "[r]ecklessness is distinguishable from negligence on the basis that recklessness requires conscious action or inaction which creates a substantial risk of harm to others, whereas negligence suggests unconscious inadvertence." ***Tayar***, ***supra*** at 1200.

As our Supreme Court explained in ***Tayar***, to satisfy this burden Ms. Monroe must establish that Camelback did an act or intentionally failed to do an act which it was its duty to Ms. Monroe to do, knowing or having reason to know of facts which would lead a reasonable person to realize, not only that Camelback's conduct created an unreasonable risk of physical harm to her, but also that such risk was substantially greater than that which was necessary to make its conduct negligent. ***Id***. at 1200-01 (citing Restatement (2d) of Torts § 500). ***See also*** Restatement (2d) of Torts § 501(1) ("[T]he rules which determine the actor's liability to another for reckless disregard of the other's safety are the same as those which determine his liability for negligent misconduct.").

---

[14] ***Wittrien v. Burkholder***, 965 A.2d 1229, 1232 (Pa.Super. 2009).

Viewing the evidence collectively and in the light most favorable to Ms. Monroe as the non-moving party, we conclude that she produced sufficient evidence to enable a fact-finder to conclude that Camelback consciously engaged in conduct that created an unreasonable risk of physical harm to her that was substantially greater than mere negligence. Specifically, Ms. Monroe's proffered evidence was capable of proving the following.[15] Mr. Wolf explained that the construction of a zip-line is "such that no part of a rider is intended to collide with any hard surface until the rider reaches the end of the zip[-]line." Memorandum of Law in Support of Response in Opposition to Motion for Judgment on the Pleadings and Supplemental Motion for Summary Judgment, 5/16/19, Exhibit A at 2. However, the height of Camelback's line was "low enough that a rider's legs may contact the ground before the pulley carriage contacts the breaking device" at the end of the ride. *Id*. "If the ground is free of surface imperfections, a rider's feet will drag smoothly along the ground, up a wooden platform, causing a reduction in speed, and then the rider's forward movement will be arrested by a combination of manual braking by physical engagement of an employee, and

---

[15] We reiterate that, in an appeal from the grant of summary judgment, this Court must "apply the same standard as the trial court, **reviewing all the evidence of record** to determine whether there exists a genuine issue of material fact." *Criswell v. Atl. Richfield Co.*, 115 A.3d 906, 908–09 (Pa.Super. 2015) (emphasis added). Thus, although as noted above Ms. Monroe's appellate brief is substandard and does not present the evidence as fully and as efficiently as we might like, we conclude that waiver is inappropriate.

a mechanical impact attenuation device at the end of the line." *Id*. at 2-3. Yet no smooth landing in an area free from surface imperfections was offered by Camelback.

Specifically, while it would have been dangerous enough to have patrons' feet sliding along the ground if they were unable to comply with the directions of Camelback's staff to lift up their legs, Camelback created an even graver danger by using a wooden landing deck whose lead edge protruded at a ninety-degree angle from the ground. This hard obstruction was capable of causing injury "at the impact site on the rider's body, and anywhere else where that energy is delivered to the body." *Id*. This danger "must have been noted by one or more members of the Camelback staff, because the condition was 'remedied' by covering the protrusion with a piece of carpeting." *Id*. However, this "remedy" in actuality "concealed, rather than removed, the risk." *Id*. Mr. Wolf explained:

> That there was risk in the design by virtue of needing rider compliance with a strenuous physical task was itself an unnecessary danger that was permitted in routine operation of the zip[-]line, unwittingly reveal[ing] . . . a willingness to allow participants to be subjected to unnecessary and preventable danger.
>
> That there were physical dangers that had come to the attention of the staff, and that these known dangers were not remedied but rather were intentionally masked, or in this case, literally swept under the rug, shows a conscious disregard for safety that could not manifest other than in an accident, given sufficient time.

*Id*. at 5.

- 38 -

Enter Ms. Monroe, approaching the end of the ride not in a smooth, straight trajectory, but rippling up and down, something that Camelback knew happened multiple times each day for patrons who were toward the higher end of the zip-line's weight limit. *Id*., Exhibit C at 11-16. There was no gradual skid up a platform, but a collision with the landing platform that was "perfectly positioned to cause an injury." *Id*., Exhibit A at 4. Two collisions occurred to be exact: despite holding her legs up as she approached the landing area, Ms. Monroe first struck her leg against the landing platform, making an impact with the mats Camelback had positioned to conceal the face of the platform, swung up, came back down, spun around, and made a second impact with the platform when she hit the deck to land. *See id*., Exhibit B at 52-53, 84-85 (Ms. Monroe describing swinging up, spinning, and landing); *id*. Exhibit C at 11 (Camelback employee Brett Dunphy describing two impacts at the landing platform); Memorandum of Law, 3/12/18, at Exhibit B (Pocono Medical Center report of history and physical examination indicating that Ms. Monroe's right foot struck the platform when she landed, then felt severe pain when she tried to stand on it; discharge summary indicating that she first struck her leg "up against the landing platform").

Camelback could have readily alleviated the danger by having the patrons land at ground level or by filling in the danger zone with dirt or sand. *See* Memorandum of Law in Support of Response in Opposition to Motion for Judgment on the Pleadings and Supplemental Motion for Summary Judgment,

5/16/19, at Exhibit A. Although Camelback advertised to its patrons in the Release it had them sign that its amusements were capable of causing injury or death, it instead opted to conceal the known, obvious threat by masking it with a piece of carpeting, actively preventing Ms. Monroe from appreciating the danger to her person. *Id*., Exhibit A at 4-5.

Those facts do not suggest mere negligence. These allegations, viewed in the light most favorable to Ms. Monroe, sufficiently contend that Camelback engaged in intentional acts, knowing or having reason to know facts which would lead a reasonable person to realize that it thereby created an unreasonable risk of physical harm that was substantially greater than incompetence or unskillfulness. ***Accord Bourgeois v. Snow Time, Inc.***, 242 A.3d 637, 657–58 (Pa. 2020) (holding that, summary judgment on a claim of injury caused by recklessness was improper because, viewing expert reports in the light most favorable to the plaintiff, the ski resort defendant had a duty to bring snow-tubing patrons to a safe stop, failed to protect against unreasonable risks, and "instead increased the risk of harm to its patrons through a number of conscious acts, including using folded deceleration mats in an inadequate run-out area under fast conditions"). Therefore, given the evidence of record, the trial court erred in entering summary judgment in favor of Camelback.

## IV. Conclusion

In sum, Ms. Monroe's complaint sufficiently pled the state of mind of recklessness to defeat Camelback's motion for judgment on the pleadings, and the evidence of record created genuine issues of material fact precluding the entry of summary judgment. As such, the trial court's decision to grant Camelback's motion was in error. Therefore, we reverse the trial court's May 16, 2019 order and remand the case for trial to take place after Camelback has had a fair opportunity to supply its own expert report if it so chooses.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

P.J. Panella and Judges Bowes, Kunselman, King and McCaffery join this Opinion Per Curiam and Judge Nichols concurs in the result.

P.J.E. Bender files a Dissenting Opinion in which Judge Olson joins and Judge Stabile concurs in the result.

Judge Stabile files a Dissenting Opinion in which P.J.E. Bender and Judge Olson concur in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/21/2022