J-A23011-24

2025 PA Super 33

| | | |
|---|---|---|
| L.T., A MINOR BY AND THROUGH HIS PARENT AND NATURAL GUARDIAN, ALICIA COPENHAVER, INDIVIDUALLY AND ON BEHALF OF HER SON, L.T. | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : | |
| v. | : : | |
| KUBOTA MANUFACTURING OF AMERICA CORPORATION, KUBOTA CORPORATION, KUBOTA TRACTOR CORPORATION, AND PATRICIA GLADFELTER | : : : : : | No. 1310 MDA 2023 |

Appeal from the Order Entered August 3, 2023
in the Court of Common Pleas of York County Civil Division
at No(s): 2013-SU-003621-72

BEFORE: BOWES, J., OLSON, J., and STABILE, J.

OPINION BY BOWES, J.:                    **FILED: FEBRUARY 14, 2025**

L.T., a minor by and through his parent and natural guardian,[1] Alicia Copenhaver, and Ms. Copenhaver, individually (collectively "Plaintiffs"), challenge the order that granted the motion for summary judgment filed by Kubota Manufacturing of America Corporation, Kubota Corporation, and Kubota Tractor Corporation (collectively "Kubota" or "Defendants"). While we affirm as to the dismissal of one count that Plaintiffs do not challenge on appeal, we reverse as to the remaining counts because the trial court's decision was the product of factual and legal errors and further constituted an

---

[1] Although L.T. reached the age of majority during the pendency of this action and counsel filed a praecipe to remove the guardian and amend the caption, the notice of appeal still utilized the minor designation.

usurpation of the jury's role as fact finder. Accordingly, we remand the case for trial on those counts.

The underlying facts, viewed in the light most favorable to Plaintiffs, are as follows. On October 9, 2011, Patricia Gladfelter, while mowing the lawn using a Kubota BX2200 tractor mower, put the mower in reverse, backed up, and heard a thud. Unbeknownst to her, L.T., her seven-year-old grandson, had come into the yard and had slipped on the grass behind her. Since the mower lacked rear guarding and was designed such that the blades remained engaged when the tractor reversed, L.T.'s ankle was mangled and his foot and toes nearly severed from his body. He was life-flighted to the hospital with the mower blade still in his leg, which ultimately was amputated just below the knee.

Plaintiffs initiated this action by complaint filed on October 8, 2013. They alleged counts of negligence, strict products liability, and breach of warranty against Defendants, and negligence as to Ms. Gladfelter. Ms. Gladfelter passed away during the pendency of the case, and her estate settled the claims against her. The remaining parties continued to litigate the matter for years, with the court ultimately scheduling trial to begin in October 2023. Defendants moved for summary judgment in January 2023. Their filing stated no grounds for their entitlement for judgment as a matter of law, but incorporated by reference a brief in support of the motion. Attached to the motion were numerous exhibits, among which was the November 15, 2021

report of Jeffrey Ketchman, D.E.S., Plaintiffs' expert engineer ("Ketchman Report").

In his report, Dr. Ketchman indicated that he reviewed the factual discovery materials in the case, including L.T.'s deposition testimony and the insurance statements of Ms. Gladfelter, along with various Kubota documents such as manuals and engineering drawings. Dr. Ketchman further inspected the scene of the accident and the tractor and conducted tests of the mower once it was made operable again. His report addressed both the defects in the design of the Kubota BX2200 tractor at issue and how those defects contributed to L.T.'s injuries.

Concerning the design defects, Dr. Ketchman explained that "[b]ackward runover and blade laceration was known to be a common type of injury for children" for decades before the BX2200 was manufactured and sold to L.T.'s family. **See** Ketchman Report at 5 (cleaned up). He cited safety studies from the 1960s, 1970s, and 1980s that led to manufacturers including MTD, John Deere, and Toro utilizing a no-mow-in-reverse ("NMIR") feature on riding mowers between 1988 and 2000 and adding "graphic on[-]product warnings and instructions." **Id**. at 6. Indeed, Kubota had also incorporated a NMIR feature on some of its tractors at the time it manufactured and sold the BX2200 that injured L.T. Based upon this, Dr. Ketchman opined that the Kubota knew or should have known about the backover risk posed by the tractor in question, yet "failed to design-out the hazard, adequately guard

against it, and adequately warn about the hazard and its means of avoidance." *Id*. at 8. As such, he concluded that the BX2200 was an unreasonably dangerous and defective product, and Kubota showed a wanton disregard for the safety of consumers and minor children by not incorporating the feasible safety features. *Id*. at 9.

As the foundation for his opinion on causation, Dr. Ketchman detailed his inspection and testing of the BX2200 that harmed L.T. He noted that between the rear tires was an open space twenty inches wide and six inches high, with the closest blade at twenty-nine inches from the rear of the tractor frame. *Id*. at 3-4. There was no guard to prevent a child's limbs from going under the rear of the mowing deck in the event of a backover or slide-under, and there were no mirrors for the operator to see behind the mower. *Id*. at 8. He further observed that the tractor had "no visible hazard warning or instruction labels or pictorials" cautioning the operator of the tractor about backover hazards or manually disengaging the mowing blades when going in reverse. *Id*. at 4.

Dr. Ketchman recounted the roll-back distances and amounts of time it took the mowing blades to stop rotating when the engine of the tractor was run at different speeds. In simulating the functioning of a NMIR feature by simultaneously putting the tractor in reverse and turning off the engine, he found the maximum rollback distance of thirteen inches and blade-stopping time was three and one-quarter seconds. *Id*. at 4. Accordingly, with a NMIR

feature, BX2200 would roll back, at most, less than half the distance between the rear frame and the blades if the tractor were put in reverse with the mowing blades engaged. Therefore, Dr. Ketchman concluded that L.T. would not have sustained his injuries had Kubota incorporated the NMIR and other known safety features in the design of the BX2200. *Id*. at 9.

In moving for summary judgment, Defendants contended that, despite Dr. Ketchman's expert opinions, the Plaintiffs as a matter of law could not prevail on any of their claims. They argued that Plaintiffs failed to establish that the BX2200 was defectively designed because the tractor operated exactly as an ordinary consumer would expect, the utility of the tractor outweighed the risk of the child backover danger, and Plaintiffs did not prove that a safer alternative design would have prevented L.T.'s injuries. Specifically, citing the opinion of their expert, consulting engineer Dan Nielsen, B.S., M.B.A., Defendants insisted that even with a NMIR feature, the blades of the BX2200 would have continued rotating for more than five feet while the tractor was in reverse. Thus, L.T., who stated that he fell next to the tractor and it only backed up enough to go over one of his legs, would have sustained his injuries in any event. *See* Brief in Support of Motion for Summary Judgment, 1/12/23, at 25. Defendants moreover avowed that Dr. Ketchman proffered "no basis or foundation for the opinion that the alternative designs," such as mirrors or a rear trailing shield, would have prevented the injury. *Id*. at 26.

Defendants further maintained that they had no duty to warn of a generally-known danger, that the warnings were adequate, and there was no causal connection between the lack of warnings and harm sustained by L.T. *Id*. at 28-32. Finally, they asserted that the breach of warranty claim failed as a matter of law since the express warranty expired, the implied warranties were disclaimed, and the product was not defective. *Id*. at 33-35.

Plaintiffs filed a response to Defendants' motion, indicating that, since the motion itself contained no specific averments to which to respond, they likewise incorporated by reference their brief in opposition to summary judgment. Plaintiffs simultaneously filed of record said brief, attaching thereto various exhibits, including studies documenting children's mower-related injuries along with the Ketchman Report and its attachments. In the brief, Plaintiffs disputed Defendants' recitation of the factual record and applicable law and offered legal analysis supporting the viability of their claims, excepting that of breach of express warranty, which Plaintiffs purported to voluntarily dismiss. *See* Brief in Opposition, 2/14/23, at 47 n.9 (pagination supplied).

Defendants thereafter filed a reply brief contesting Plaintiffs' allegations of misstatements of the evidence, asserting that Plaintiffs relied upon overruled decisions, and noting that Plaintiffs failed to dispute that the breach of implied warranty claims were time barred.

Following oral argument, the trial court granted the Kubota Defendants' motion, entering judgment as a matter of law in their favor and against

Plaintiffs as to all counts of the complaint by order of August 3, 2023.[2]  In its accompanying opinion, the court initially indicated that it would not consider any of the evidence proffered by Plaintiffs in opposing Defendants' request for summary judgment because the documents were attached to their brief in opposition to the motion, rather than to their response to the motion.  **See** Trial Court Opinion, 8/3/23, at 7-8.  The court also determined that, based upon this Court's decision in **Sullivan v. Werner Co.**, 253 A.3d 730 (Pa.Super. 2021), *aff'd*, 306 A.3d 846 (Pa. 2023) (plurality), Kubota's compliance, or lack thereof, with industry safety standards was irrelevant to its "analysis of material disputes of fact with respect to the products liability claims."  Trial Court Opinion, 8/3/23, at 12.

Nonetheless, the court discussed both the Ketchman Report and industry standards in addressing the viability of Plaintiffs' claims, if only to highlight how they might have defeated the motion for summary judgment if they were able to be considered.  **See**, **e.g.**, **id**. at 16 ("Plaintiffs have **not** provided sufficient evidence **of record** to consider this a 'battle of the experts' which might preclude summary judgment on this claim.  A jury, unable to consider Plaintiffs' expert report, would not be able to conclude what was a reasonable design for the Kubota BX2200[.]" (emphases in original, footnote

_____

[2] The trial court's August 3, 2023 order omitted Kubota Corporation as a defendant.  Upon the motion of the parties, the court modified the order to clarify that judgment was entered in favor of all three Kubota Defendants.  **See** Order, 10/4/23.

omitted)); *id*. at 17 n.26 ("Plaintiffs' expert's opinion requiring Kubota to guard against the backover hazard for children by way of mirrors, guards, or a different NMIR safety feature, as it was feasible in his opinion, provides no factual data by which jury could make a reasonable determination between the two reports as it, again, is not part of the record.").

Ultimately, the court relied upon the opinions of Kubota's expert, and the industry standards alleged by the defense to apply to the BX2200, to conclude that Plaintiffs' strict and negligent product liability claims failed as a matter of law. *See*, *e.g.*, *id*. at 14-15, 18-19 (crediting the facts and opinions proffered by the defense expert); *id*. at 21 (making a factual finding that the standards advocated by Kubota, rather than those suggested by Plaintiffs, governed the BX2200). The court also rejected Plaintiffs' claims for breach of warranty. Accordingly, the court entered an order granting summary judgment to Defendants and cancelling trial. *See* Order, 8/3/23.

By motion filed the following week, Plaintiffs implored the trial court to reconsider its ruling. They cited, *inter alia*, this Court's decision in ***Monroe v. CBH20, LP***, 286 A.3d 785, 802–03 (Pa.Super. 2022) (*en banc*), for the proposition that the exhibits attached to their brief, which was filed of record and incorporated by reference in their response to the summary judgment motion, were part of the record. Defendants filed a response asserting that the court had considered the brief's exhibits but determined that they

nonetheless failed to establish issues of material fact warranting a trial. The trial court denied Plaintiffs' reconsideration request.

This timely appeal followed.[3] Both Plaintiffs and the trial court complied with Pa.R.A.P. 1925. Plaintiffs present the following questions for our consideration:

1. In accordance with **Monroe** . . . and Pa.R.Civ.P. 1035.1, should the trial court have considered Plaintiffs' liability expert report to be part of the record, where said report was filed with the court by being attached to Defendants' motion for summary judgment and Plaintiffs' brief in opposition?

2. Did the trial court err by disregarding the well-supported conclusions of Plaintiffs' liability expert report, which, based on evidence of record, found that multiple safer alternative designs were reasonable and necessary and would have prevented L.T.'s traumatic leg amputation, particularly where disregarding said expert report caused the trial court to wrongly conclude the subject product was not defective, Defendants were not negligent, and the product defect and Defendants' negligence were not the proximate cause of Plaintiffs' damages?

3. Did the trial court err as a matter of law and improperly invade on the province of the jury by making determinations on disputed material facts, particularly where in doing so the trial court did not view the evidence in the light most favorable to the non-moving party?

4. Should the trial court have applied the consumer expectations test, as articulated by **Tincher v. Omega Flex**, 104 A.3d 328 (Pa. 2014), and found the subject Kubota tractor mower defective?

_____

[3] Plaintiffs electronically filed their notice of appeal on August 22, 2023, but the prothonotary rejected it because Plaintiffs failed to submit the associated fee. Upon Plaintiffs' motion, the court entered an order deeming the appeal to have been filed on August 22, 2023.

Plaintiffs' brief at 6-7.

We begin with our standard of review:

In reviewing a grant of summary judgment, this Court's standard of review is *de novo* and our scope of review is plenary. A trial court should grant summary judgment only in cases where the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The moving party has the burden to demonstrate the absence of any issue of material fact, and the trial court must evaluate all the facts and make reasonable inferences in a light most favorable to the nonmoving party. The trial court is further required to resolve any doubts as to the existence of a genuine issue of material fact against the moving party and may grant summary judgment only where the right to such a judgment is clear and free from doubt. An appellate court may reverse a grant of summary judgment only if the trial court erred in its application of the law or abused its discretion.

***Toth v. Chambersburg Hosp.***, 325 A.3d 870, 873–74 (Pa.Super. 2024) (cleaned up).

Plaintiffs' first issue requires us to clarify what constitutes "the record" for purposes of assessing the existence of a genuine issue of material fact that would render summary judgment inappropriate. In its Rule 1925(a) opinion, the trial court avowed its position that briefs are not part of the record according to the decisions in ***Erie Indemnity Company v. Coal Operators Casualty Company***, 272 A.2d 465 (Pa. 1971), and ***Scopel v. Donegal Mutual Insurance Company***, 698 A.2d 602 (Pa.Super. 1997). The court reiterated its belief that "[n]othing in the Rules of Civil Procedure or in case precedent permits this [c]ourt to consider attachments to [Plaintiffs' brief], as

the brief, and therefore the attachments, are not part of the record." Trial Court Opinion, 10/10/23, at 5.

The trial court's determination in this regard is incorrect on both counts. Our Rules of Civil Procedure define "record" for purposes of summary judgment as: "(1) pleadings, (2) depositions, answers to interrogatories, admissions and affidavits, and (3) reports signed by an expert witness that would, **if filed**, comply with Rule 4003.5(a)(1), whether or not the reports have been produced in response to interrogatories." Pa.R.Civ.P. 1035.1 (emphasis added). As this Court explained in **Monroe**, a precedential case not mentioned by the trial court despite Plaintiffs' citation to it: "The foregoing language suggests that expert reports need only be submitted, **not filed**, in order to be considered in ruling on the motion for summary judgment," where, as here, the signed report contains "the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion" in conformity with Rule 4003.5(a)(1). **See Monroe**, 286 A.3d at 802 (emphasis in original).

The **Monroe** Court, sitting *en banc*, further explained that when evidence had been attached to a brief that was filed of record with the prothonotary, it thereby became part of the record a court must consider before granting summary judgment. **Id**. at 803. We distinguished **Scopel**, in which the briefs to which the evidence was attached were submitted to the trial court **but never filed with the prothonotary**. **Id**. at 802 (citing

*Scopel*, 698 A.2d at 604 ("These depositions . . . were never filed and made a part of the official record.")).

Moreover, the *Monroe* ruling is not in conflict with our Supreme Court's holding in *Erie*. There, the Court observed that the trial court "took into consideration facts alleged in the briefs, but briefs are not part of the record, and the court may not consider facts not established by the record." *Erie*, 272 A.2d at 466-67 (footnotes omitted). Viewed in context, it is plain that the problem in *Erie* was that there was no evidentiary support for the facts recounted by counsel in the brief, not that documents defined as part of the record by Rule 1035.1 were unable to be considered if they were filed as an attachment to a document with a cover page that said "brief."

Furthermore, Dr. Ketchman's report was filed as an exhibit to Defendants' motion for summary judgment, along with the report of the defense expert report upon which the trial court repeatedly relied in ascertaining that there was no genuine issue of fact for trial. Hence, the report of Plaintiffs' expert was part of the record even under the trial court's definition of that term.

Thus, the trial court should have considered Dr. Ketchman's report, and the other evidence that Plaintiffs made part of the record by attaching to their filings in opposition to Defendants' motion for summary judgment, in assessing whether there was a factual dispute for the jury's resolution. In refusing to do so, the court erred.

Defendants argue that, despite its indications to the contrary, the trial court did in fact consider Dr. Ketchman's report in adjudicating the summary judgment motion, as evinced by its criticism of the substance of the report. *See* Defendants' brief at 29-32. Certainly, as outlined above, the court reviewed and critiqued Dr. Ketchman's report. Nonetheless, the court made it plain, both in its initial opinion and its Rule 1925(a) opinion authored in response to Plaintiffs' allegations of error, that it believed that the report could not create issues of fact to defeat summary judgment because it was not part of the record.[4] As such, Defendants' contention that this issue is a red herring is inaccurate.

Defendants assert that, even if the trial court failed to consider Dr. Ketchman's report, no relief is due unless this Court concludes that the report

---

[4] *See*, *e.g.*, Trial Court Opinion, 8/3/23, at 8 ("[W]e cannot consider any attachment to Plaintiff[s'] Brief as the basis for a dispute of material fact because the attachment is not a part of the record for purposes of the instant motion."); *id*. at 16 ("[T]here is no relevant factual data of record in the Plaintiffs' expert report given that the report was attached only to their brief, not their response of record . . . Therefore, Plaintiffs have not provided sufficient evidence of record to consider this a 'battle of the experts' which might preclude summary judgment on this claim."); *id*. at 17 n.26 ("Plaintiffs' expert's opinion requiring Kubota to guard against the backover hazard for children by way of mirrors, guards, or a different NMIR safety feature, as it was feasible in his opinion, provides no factual data by which a jury could make a reasonable determination between the two reports as it, again, is not part of the record."); Trial Court Opinion, 10/10/23, at 4-6 ("Having found Dr. Ketchman's report was not part of the record because it was improperly attached to [Plaintiffs'] brief, . . . we need not address the contents of the report itself as alleged as error on appeal here.").

creates genuine issues of material fact. **See** Defendants' brief at 32. On this point, we agree. Suitably, Plaintiffs' remaining questions ask us to determine whether a proper examination of the record mandates a different result, or whether the trial court's error was harmless.

We begin that assessment with a review of applicable legal principles. Regarding the burden of the moving party at summary judgment, the ***Nanty-Glo***[5] rule provides that "[t]estimonial affidavits of the moving party or his witnesses, not documentary, even if uncontradicted, will not afford sufficient basis for the entry of summary judgment, since the credibility of the testimony is still a matter for the factfinder." ***DeArmitt v. New York Life Ins. Co.***, 73 A.3d 578, 595 (Pa.Super. 2013) (cleaned up). This rule applies to all witnesses offered by the moving party, including experts. ***Id***. at 598. In this vein:

> It has long been Pennsylvania law that, while conclusions recorded by experts may be disputed, the credibility and weight attributed to those conclusions are not proper considerations at summary judgment; rather, such determinations reside in the sole province of the trier of fact, here, a jury. Accordingly, trial judges are required to pay deference to the conclusions of those who are in the best position to evaluate the merits of scientific theory and technique when ruling on the admissibility of scientific proof.
>
> At the summary judgment stage, a trial court is required to take all facts of record, and all reasonable inferences therefrom, in a light most favorable to the non-moving party. This clearly includes all expert testimony and reports submitted by the non-moving party or provided during discovery; and, so long as the

---

[5] ***Borough of Nanty–Glo v. American Surety Co. of New York***, 163 A. 523 (Pa. 1932).

- 14 -

conclusions contained within those reports are sufficiently supported, the trial judge cannot sua sponte assail them in an order and opinion granting summary judgment. Contrarily, the trial judge must defer to those conclusions, and should those conclusions be disputed, resolution of that dispute must be left to the trier of fact.

**Summers v. Certainteed Corp.**, 997 A.2d 1152, 1161 (Pa. 2010) (cleaned up).

In the case *sub judice*, Plaintiffs argue that, in concluding that Defendants were entitled to judgment as a matter of law on their strict liability and negligence claims, the trial court invaded the province of the jury by deciding disputed facts in favor of Defendants rather than viewing the evidence in the light most favorable to Plaintiffs.[6] Specifically, Plaintiffs fault the court for accepting the opinions and industry standards proffered by Defendants' expert in finding that the BX2200 was not defective and that the safety features suggested by Plaintiffs would not have prevented L.T.'s injury. **See** Plaintiffs' brief at 55-65.

We agree. The trial court expressly adopted the facts and opinions stated by Mr. Nielsen, Defendants' expert, in ruling that Plaintiffs cannot prevail on their claims. For example, it credited his finding that, due to the weight and speed of the blades, even with a NMIR feature, they would continue to rotate up to ten feet after the tractor was put into reverse, along

---

[6] Plaintiffs do not challenge on appeal the trial court's ruling as to their breach of warranty claims. Accordingly, we affirm the trial court's order insofar as it granted summary judgment on that theory of relief.

with his factual inferences that L.T. fell very close to the tractor and "Ms. Gladfelter failed to turn her head even slightly to observe/check behind her before reversing," to conclude that L.T. would have been injured all the same had the BX2200 had a NMIR feature.[7] **See** Trial Court Opinion, 8/3/23, at 13-15. The court also indicated that, in evaluating the record, it accepted Mr. Nielsen's findings that Ms. Gladfelter "would have known" that the blades spun regardless of the speed or direction of the tractor and that, based upon the way the EMTs found the blade stuck in L.T.'s leg, Ms. Gladfelter must have shut the mower off after running over the leg, but before the blades contacted it. **See** Trial Court Opinion, 10/10/23, at 8-9. Further, faced with a disagreement between the parties as to which industry standards governed the nature of warning stickers placed on the tractor, the court made a finding that those for which Defendants advocated applied, rather than recognizing that the disputed fact had to be resolved by the jury. **See** Trial Court Opinion, 8/3/23, at 21 n.30.

_____

[7] In another example of the court crediting the moving party's witness and failing to view the evidence favorably to the non-moving party, the trial court noted that, two weeks after the incident, Ms. Gladfelter opted to buy a different manufacturer's tractor mower that also lacked a NMIR feature, implying that even if the BX2200 had one, she would have been one of the "nearly 50% of customers" who disabled the system, which, according to Kubota's expert, increased the amount of time it took to mow a yard by up to 40%. **See** Trial Court Opinion, 8/3/23, at 18-19. The court additionally appeared to fault Ms. Gladfelter and absolve Kubota in finding that the BX2200 did not lack sufficient warnings to render the mower safe for its intended use, as its operating manual "forbid operation of the subject tractor in the presence of bystanders, particularly children." **Id**. at 19.

The trial court thus repeatedly misapplied the law in evaluating the summary judgment record. **Accord DeArmitt**, 73 A.3d at 598 ("[T]he parties presented conflicting evidence through the presentation of expert evidence . . . . The court erred when it chose between conflicting expert evidence at the summary judgment stage and relied on the moving party's expert report to decide a material issue of disputed fact . . . . The credibility and weight to be attributed to the experts' conclusions were not proper considerations at summary judgment.").

Still, these myriad errors do not warrant relief if a proper review of the whole record reveals no genuine issues of material fact. Thus, we now turn to the adequacy of Dr. Ketchman's report in offering opinions which, if credited by the fact finder, would warrant a verdict in favor of Plaintiffs. To do so, we must first consider the legal requirements of their theories for relief.

A strict liability claim pursuant to § 402A of the Restatement (Second) of Torts, allows recovery "where a product in a defective condition unreasonably dangerous to the user or consumer causes harm to the plaintiff." **Phillips v. A-Best Products Co.**, 665 A.2d 1167, 1170 (Pa. 1995) (cleaned up). "There are three different types of defective conditions that can give rise to a strict liability claim: design defect, manufacturing defect, and failure-to-warn defect." **Id**. For all three theories of liability, the plaintiff must prove that the product's defect caused harm. **See**, **e.g.**, **Zimmerman v. Alexander Andrew, Inc.**, 189 A.3d 447, 452 (Pa.Super. 2018).

Here, Plaintiffs have alleged strict liability design defect and failure to warn.  Our Supreme Court explained as follows regarding the former:

> The plaintiff may prove defective condition by showing either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer, or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. The burden of production and persuasion is by a preponderance of the evidence.
>
> Whether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue.

*Tincher*, 104 A.3d at 335 (cleaned up).  The consumer-expectations and risk-utility paradigms are not mutually exclusive, and plaintiffs may pursue them both in the alternative.  *Id*. at 408.

To determine whether a product is defective under the risk-utility test, the court must assess the following non-exclusive factors:

> the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

*Sullivan*, 306 A.3d at 861 (cleaned up).  The consumer expectations test, on the other hand, examines "the nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller." *High v. Pennsy Supply, Inc.*, 154 A.3d 341, 350 (Pa.Super. 2017) (cleaned up).

Separately, a product can also be defective if a plaintiff establishes that "a warning of a particular danger was either inadequate or altogether lacking, and that this deficiency in warning made the product 'unreasonably dangerous.'" *Id*. at 351 (cleaned up). "For the plaintiff in a failure-to-warn claim to establish the second element, causation, the plaintiff must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller." *Phillips*, 665 A.2d at 1171.

While the strict liability claims focus upon the condition of the product, Plaintiffs' negligent design claim examines the actions of the defendant. "To prevail in a negligence action, the plaintiff must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage." *Barton v. Lowe's Home Centers, Inc.*, 124 A.3d 349, 359 (Pa.Super. 2015). While breach, causation, and damages are fact questions for the jury, the existence of a duty is a question of law determined by the balancing of the following factors: "(1) the relationships between the parties; (2) the social utility of the defendant's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the defendant; and (5) the overall public interest in the

proposed solution."[8] *Id*. (citing *Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000)).

Our High Court recently confirmed that "evidence of a product's compliance with industry or government standards is not admissible in design defect cases to show a product is not defective under the risk-utility theory." *Sullivan*, 306 A.3d at 863. *See also id*. at 864 (Donohue, J., concurring) ("[E]vidence that a defendant conformed its conduct to that of others in its industry in designing its product is irrelevant in determining whether, in a design defect case, a product is unreasonably dangerous for purposes of strict liability under [§] 402A.").

---

[8] Defendants do not advocate for affirming the grant of summary judgment on Plaintiffs' negligence claim on the basis that they owed no legal duty to L.T. pursuant to the *Althaus* analysis. Therefore, we need not confirm the existence of a duty in evaluating the negligence claim. *Accord Shamis v. Moon*, 81 A.3d 962, 970 (Pa.Super. 2013) (opining that this Court "cannot affirm a trial court's grant of summary judgment upon an argument that was never raised in support of the summary judgment motion"). However, we note that our *Barton* ruling involved strict liability and negligence claims of defective lawnmower design where the mower overheated and burned down the plaintiff's barn. This Court, in assessing the *Althaus* factors to find a duty existed, observed, *inter alia*, that "the utility of lawnmowers is obvious, but a lawnmower outfitted with safeguards against overheating has even greater utility," and that the "the public has a strong interest in minimizing the risk of harm that lawnmowers present to persons and property." *Barton*, 124 A.3d at 359. Also, in *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 62-68 (3d Cir. 2009), the Third Circuit Court of Appeals conducted a full *Althaus* balancing and concluded that the manufacturer of mower lacking NMIR and rear barrier safety features owed a duty of care to the child who was injured when her grandfather backed over her leg.

However, the Court did **not** rule that a defendant's **lack of** compliance is inadmissible in a product liability action to establish the existence of a safer feasible design or other aspect of the product's defectiveness. *Id*. at 870-71 (Todd, C.J., dissenting) ("A product's failure to comply with governmental or industry standards alone may allow the jury to infer that a product design is unreasonably dangerous. . . . [G]overnmental and industry standards **are** admissible in a plaintiff's case." (emphasis in original)). Additionally, "evidence of industry standards and regulations is generally relevant and admissible on the issue of negligence." *Birt v. Firstenergy Corp.*, 891 A.2d 1281, 1290 (Pa.Super. 2006).

We now apply these principles to the evidence in this case. Plaintiffs maintain that Dr. Ketchman's report, which we have detailed above, was supported by the record such that the court was required to accept, for purposes of ruling on Defendants' motion for summary judgment, his opinions that the BX2200 was defective because it lacked feasible safety features including a rear guard like those that are standard on push mowers, a NMIR engine-kill feature, rear-view mirrors, and adequate warnings, and that those defects caused harm to Plaintiffs. *See* Plaintiffs' brief at 38-47, 49-51. Plaintiffs contend that, viewing the report and the rest of the record in the light most favorable to them, they have produced sufficient evidence to establish each element of their causes of action of negligence and strict liability. They further argue that, even if Dr. Ketchman's report was not

sufficient to sustain their defective design claim pursuant to the risk-utility analysis, they proffered adequate evidence to proceed under the consumer expectations test. *Id*. at 66-71.

Defendants, on the other hand, advance the position that summary judgment was correctly entered in their favor because Plaintiffs failed to produce evidence to establish the causation element of any of their claims. In particular, they insist that Dr. Ketchman's causation opinions are properly disregarded as speculative, arguing that "Dr. Ketchman draws conclusions regarding causation without citing any basis in the record" and without explaining "how the purported defects caused [L.T.]'s injuries" or how adding the missing safety features would have prevented them. *See* Defendants' brief at 33-34. Defendants essentially posit that, with Ms. Gladfelter having passed away before she was deposed and L.T.'s lack of recall of the details of the incident given his youth at the time, it is impossible for Dr. Ketchman or any expert to reference the "critical details necessary to prove causation without speculating." *Id*. at 35-36. Defendants claim that:

> (1) the only facts of record show the accident sequence happened very quickly; (2) no safety feature on the market or made up in Dr. Ketchman's mind, nor any instruction or warning, has been shown to prevent accidents where a child is immediately behind the machine (due to blade wind-down time); and (3) the operator neither heeded warnings provided nor looked before she backed up.

*Id*. at 36.

Citing their own witness's representation that it takes up to nine feet of reversing before the blades stop "[o]n other products equipped with a similar system," Defendants argue that Dr. Ketchman never explains how he could conclude that a NMIR feature would have prevented the injury without knowing how long Ms. Gladfelter drove in reverse before encountering L.T.[9] *Id*. at 37. Defendants allege that "Dr. Ketchman's remaining opinions are even farther afield," since he does not (1) cite facts or data showing that rear-view mirrors prevent backover injuries generally or would have prevented L.T.'s injuries specifically; (2) explain how a rear guard would have prevented L.T.'s leg from going under the mower; (3) indicate what warning language would have prevented L.T. from being harmed. *Id*. at 40-43. Relying primarily upon this Court's non-precedential decision in ***Cooper v. Kratz Enterprises, Inc.***, 296 A.3d 652, 2023 WL 2706691 (Pa.Super. 2023) (non-precedential decision), Defendants maintain that summary judgment is appropriate where, as here, the non-moving party's expert opinion is based upon conjecture rather than facts. ***See*** Defendants' brief at 44-45.

Defendants also argue that, even if we find that Dr. Ketchman's report was sufficiently supported, we nonetheless should affirm the dismissal of the failure to warn claims because Plaintiffs produced no evidence that Ms.

---

[9] Mr. Nielsen referenced "Kubota testing on an exemplar BX2200D tractor" and opined that Dr. Ketchman's testing must be erroneous since it achieved "such radically different results[.]" Nielsen Report at 36 (included in the certified record as Exhibit I to Defendants' motion for summary judgment).

Gladfelter would have avoided the risk if she had been given adequate warnings. *Id*. at 51. They contend the evidence instead shows that Ms. Gladfelter's choices were unaffected by cautionary instruction, pointing to unheeded general warnings in their manuals about keeping pets and bystanders, particularly small children, at a distance while operating the tractor and its implements. *Id*. at 52. They also note a specific direction in the mower deck manual not to "mow while in reverse unless absolutely necessary and then only after inspecting the entire area behind the mower," and point to visual warnings "depicting the dangers of exposing herself and others to catastrophic injuries from the rotating blades." *Id*. at 53-53.

Finally, Defendants maintain that Plaintiffs' claims equally fail under the consumer expectations paradigm for want of proof of causation. *Id*. at 56. They concomitantly argue that the BX2200 was not defective under that theory because it "presented no danger beyond the expectations of an ordinary consumer." *Id*. at 57.

From a thorough review of the summary judgment record, we conclude that Plaintiffs' strict liability and negligence actions are supported by sufficient evidence to warrant a trial. Initially, we disagree with Defendants' assessment of Dr. Ketchman's report as not well-supported. The report delineated that Dr. Ketchman's opinions were based upon his review of enumerated

documents establishing the facts of the case;[10] his inspection of the site of the accident and the BX2200; his testing of the tractor; his "formal education, experience and expertise in mechanical, safety, and human-factors engineering, and product design" as reflected in his curriculum vitae; application of the safety design hierarchy ("SDH"), which is the "universally accepted standard for the design of all products, including the [BX2200;]"[11] and his "investigation of riding lawnmower/tractor child backover amputation incidents" and "analysis of NMIR safety features and alternative safer designs since the early 1990s."  Ketchman Report at 2-6.

Based upon his review of the case documents, Dr. Ketchman gathered that the backover occurred in an open and level area near the back of the

---

[10] An attachment to the report lists the case-specific materials he reviewed, which included:  the complaint; Ms. Gladfelter's discovery responses; photographs of the mower in question; the depositions of L.T., L.T.'s mother, L.T.'s uncle, and three Kubota representatives or managers; Ms. Gladfelter's statements to her insurance company; EMS reports and medical records; and engineering drawings and operator's manuals for the BX2200 and other mower models.  *See* Ketchman Report at Attachment 1.

[11] Dr. Ketchman explained:

> [T]he basic steps of the SDH require the manufacturer of a product to seek out and evaluate all potential hazards associated with its use, and (1) eliminate the hazard(s) by design if feasible, (2) for residual hazards, incorporate safety features in the design that will protect against the hazard and mitigate injury (such as guarding) and (3) warn about the hazard and instruct in means of avoidance.

Ketchman Report at 5.

yard.  Ms. Gladfelter knew L.T. to be playing on a swing set on the other side of the yard.  Unbeknownst to her, L.T. left the swing set to chase a toy plane in the direction of the mower, when he slipped on the fresh-cut grass and landed on his stomach.  Still unaware that he was behind her, Ms. Gladfelter backed up the tractor.

From inspecting the BX2200, Dr. Ketchman discerned that the tractor had "no visible hazard warning or instruction labels or pictorials that caution the operator about the child backover hazards [or] about backover hazards while mowing, operating in reverse, or mowing in reverse." Ketchman Report at 4.  Additionally, the mower lacked "hazard warning or instruction labels or pictorials cautioning the operator to turn off or disengage the mowing blades when operating the [mower] in reverse or backing up." *Id*.  Based upon these facts, Dr. Ketchman opined that the product did not satisfy the applicable industry safety standards. *Id*.

Dr. Ketchman detailed studies documenting knowledge of "the backward runover hazard" dating back to the 1960s, when design concepts to avoid injuries to children, such as blade guarding, began to be explored.  The U.S. Consumer Product Safety Commission proposed rules in 1977 to require riding mowers to have the blades stop when the tractor was put in reverse, and in 1988 commissioned a study that culminated in a 1993 report designating "NMIR as the first safety design objective[.]" *Id*. at 5.  One major manufacturer had by that time incorporated a NMIR feature in its design for a

decade which "dramatically decreased their incidents of serious back over injuries." *Id*. In the next few years, other major manufacturers, including Kubota on some of its models, "incorporated NMIR engine kill or blade kill devices and added graphic on-product warnings and instructions." *Id*. at 6.

Based upon this information specific to the backover hazard to children, Dr. Ketchman opined that "Kubota should have taken positive steps in the design of [the BX2200] to prevent such blade-laceration injuries and deaths." *Id*. The tests Dr. Ketchman performed simulating the NMIR function on Ms. Gladfelter's BX2200 revealed that L.T.'s injuries would not have occurred had the Kubota Defendants incorporated the known and feasible NMIR feature in their design of the BX2200. Dr. Ketchman further asserted that Kubota failed to follow the SDH by providing guarding at the rear of the mower, as has been utilized for many years in push mowers, to block entry of feet into the danger zone of the blades. *Id*. at 7. He described how he tested a model guard on a riding mower and found it to be feasible, and also identified another manufacturer's design "that suspended the mowing deck on a structural ring, which provides guarding on all sides." *Id*. Additionally, he opined that Kubota should have provided rear-view mirrors, which it had by then designed for the BX2200 model, to give operators visibility behind them while moving forward or backward. *Id*.

Finally, as to Plaintiffs' failure to warn claims, Dr. Ketchman indicated that Kubota's "failure to provide **any** visible warnings for [the BX2200]

increased the danger and added to the product's defective condition" given that it chose not to utilize a NMIR system or guarding with that model. *Id*. at 7-8 (emphasis in original). Dr. Ketchman concluded his report by stating "within a reasonable degree of engineering and safety-engineering certainty" that the absence of each of these technically and economically feasible safety features caused or substantially contributed to L.T.'s injuries. *Id*. at 8-9.

From the above, it is plain to us that Dr. Ketchman's opinions were based upon facts, not mere speculation akin to the rejected expert report in *Cooper*, the case which Defendants claim supports their position. In that case, Cooper sued her employer's landlord claiming that she was injured by exposure to hazardous substances in the office when Kratz installed a new heating system. She supported her claim with the expert report of Frederick W. Fochtman, Ph.D. This Court ruled that Dr. Fochtman's report did "not raise a genuine issue of material fact because it [wa]s based on conjecture and not on facts." *Cooper*, 2023 WL 2706691, at *7. In particular:

> Dr. Fochtman explain[ed] that Landlord hired Kratz to install a new heating system in the building where [Cooper] worked. Afterwards, [Cooper] reported a chemical odor in her workplace and began receiving medical treatment for problems with her nose and throat. Dr. Fochtman opined that several harmful chemicals found in a rust preventative used in the heating system were the cause of the odor in [Cooper]'s workplace. Dr. Fochtman concluded that [Cooper] developed an allergy to those chemicals and that this allergy has negatively impacted her health. In support of his conclusion, Dr. Fochtman referred to a safety data sheet for the rust preventative which lists several of the chemicals that he identified among its components.

> However, there is no evidence in the record to indicate that this rust preventative was used in the heating system that Kratz installed in Landlord's building. Further, [Cooper] has not presented any evidence that the harmful chemicals that Dr. Fochtman identified were present in her workplace.

*Id*. at *7-8 (cleaned up). In other words, Cooper had no evidence to support a finding that she had been exposed in her workplace to the chemicals her expert blamed for her injuries.

The **Cooper** Court relied upon **Krishack v. Milton Hershey School**, 145 A.3d 762 (Pa.Super. 2016), in affirming the grant of summary judgment to the defendants. In **Krishack**, the plaintiff sued Milton Hershey School ("MHS"), where he performed farm-related chores as a student, alleging that he developed histoplasmosis more than half a century later as a result of exposure to *H. capsulatum* fungus at MHS. Krishack offered the expert report of David Laman, M.D., indicating that histoplasmosis is only caused by exposure to that particular fungus, that chicken coops are a source of the fungus, and, therefore, Krishack's work cleaning out chicken coops at MSH was the source of his disease. The trial court rejected the expert reports as founded upon speculation and granted summary judgment to MHS.

On appeal, Krishack argued that Dr. Laman's conclusion was based upon simple deductive reasoning rather than conjecture. We disagreed, reasoning thusly:

> The evidence in this case is that [Krishack] was a student at MHS for approximately five years, from 1948 to 1953, during which time he performed farm chores before and after school that included baling hay and cleaning out a chicken coop. Over the

- 29 -

approximately sixty years since that time, [Krishack] has performed similar tasks at other farms, worked construction as a general laborer, which required the raking and shoveling of soil, and owned horses that he trained at a dirt track. For the majority of those sixty years, [Krishack] lived throughout Ohio and Pennsylvania, both of which are known to have soil containing *H. capsulatum fungus*. *H. capsulatum*, which can be found in the soil of a chicken coop, causes histoplasmosis, but there was no evidence that the fungus is in all chicken coops or that it was present at MHS at any time.

> . . . .

Based on these facts, Dr. Laman's opinion that, because [Krishack] had histoplasmosis at some unidentified point in his life, the soil at MHS over sixty years ago must have contained *H. capsulatum*, and that this caused his . . . disease, requires more than simple deductive reasoning, but instead required impermissible speculation and conjecture.

*Id*. at 767 (cleaned up).

For the case *sub judice* to be analogous to **Krishack** and **Cooper**, Dr. Ketchman's report would have had to merely stated that L.T.'s injuries were consistent with those caused by a mower lacking safety features to guard against the backover hazard and, therefore, the BX2200 must have lacked those safety features, even though there was no evidence that the features were omitted from its design. However, there is no question here that L.T. was injured by Defendants' mower and that it, in fact, lacked the features that Dr. Ketchman opined were necessary to render it safe for its ordinary use.

Dr. Ketchman's report further detailed how the absent features would have prevented the injuries by: (1) cutting power to the blades as soon as the mower was in reverse; (2) allowing Ms. Gladfelter to see L.T. approaching

from the rear **before** he slipped and fell and she began to reverse; and (3) blocking L.T.'s leg from the otherwise unimpeded access to the blades. Concerning the failure-to-warn claim, Dr. Ketchman indicated that proper caution indicators would have avoided the harm by ensuring Ms. Gladfelter was aware of the specific risk to small children posed by mowers with blades that continue to operate while the tractor is in reverse gear, which was well known to the Kubota Defendants and other industrial entities, but not so obvious to the layperson as the general danger posed by mowers about which Defendants did warn. In this way, unlike the opinions in **Krishack** and **Cooper**, Dr. Ketchman's opinion applies logic to supported facts to conclude that Defendants' defective design, lack of adequate warnings, and negligent conduct contributed to or caused L.T. to lose his leg.

Additionally, we are unpersuaded by Defendants' argument that Ms. Gladfelter's failure to heed the general hazard warnings included within its various manuals defeats Plaintiffs' failure-to-warn claims. We agree with Plaintiffs that this argument mischaracterizes the particular danger at issue both in terms of the need to warn and consumer expectations:

> The danger at issue here is not just rotating blades. The danger here is the child backover hazard—a danger Kubota was well aware of. In fact, because of this child backover hazard, the Kubota Defendants supplied their other consumer tractor mowers with a NMIR safety feature and provided warnings specific to this child backover hazard on its other tractor mowers, but not this one.

- 31 -

Plaintiffs' reply brief at 24. Ms. Gladfelter's failure to avoid the hazard from the warnings that Kubota did provide does not preclude the fact-finder from deciding that the warnings Kubota employed were inadequate and their inadequacy was a substantial contributing factor to the harm. *Accord Zimmerman*, 189 A.3d at 458-59 (reversing the trial court's decision to grant summary judgment on the basis that the product's user ignored instructions where the plaintiff's expert opined that the warnings contained therein were inadequate).

Likewise, given Plaintiffs' evidence that people within the industry were aware of a specific danger to children posed by tractors that mowed in reverse without employing available safety features to prevent the child backover hazard, we cannot conclude as a matter of law that Plaintiffs' design defect may not proceed under the consumer expectations theory. As they summarize:

> Ordinary consumers expect that a manufacturer who knows—as Kubota did—that its product carries a dangerous risk of maiming children[,] specifically, will take advantage of simple, feasible, and cheap means of eliminating this risk. Ordinary consumers would not expect a manufacturer whose product consistently causes catastrophic injuries to young children to continue supplying that product without adequate safety features, particularly where it supplies other tractor mowers with such safety features.

Plaintiffs' reply brief at 27-28.

In the end, we acknowledge that Defendants have compelling arguments for rejecting Dr. Ketchman's opinions that the BX2200 was defective, for believing that ordinary consumers would have appreciated the

child backover hazard, and for finding that L.T. would have been injured even if they employed all Plaintiffs' suggested safety features. However, those are arguments appropriately presented to the jury, not to the court at summary judgment. The trial court was incorrect in holding that Plaintiffs' evidence was not of record to render summary judgment improper. Since the evidence disregarded by the trial court was indeed of record and sufficient to create genuine issues of material fact, Defendants' liability for Plaintiffs' damages on the design defect and failure-to-warn theories of strict liability, as well as their negligence claim, must be resolved at trial.

Order affirmed in part and reversed in part. Case remanded for trial. Jurisdiction relinquished.


Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary


Date: 2/14/2025